All right, the next case we're going to hear this morning is Sizemore v. Berryhill, and Mr. Fergiello. May it please the Court, my name is Sam Fergiello. I'm an attorney from Boone, North Carolina, and I represented David Richard Sizemore in this matter, not at the administrative level, but subsequent to that. Mr. Sizemore was an applicant for both social security disability benefits and civil and health security income. He alleged that he was 36 years old at the time of his decision. He had previously worked as a commercial truck driver. He based an application saying he was disabled in 2010 on an allegation of bipolar disorder and diabetes mellitus. The judge, in fact, the administrative law judge, found that he suffered from diabetes, bipolar disorder, and also substance abuse. And he concluded that he could not perform his past work, but that there was other work in the economy, and he depended on the testimony of a vocational expert to reach that point. I had advanced three arguments, in essence, challenging the decision of the administrative law judge. The first was that I did not believe that the ALJ properly followed this Court's mandate in the Mascio v. Colvin case, and the social security ruling that undergirded that SSR 96AP. Secondly, I argued that a court is required, excuse me, not a court, but the administrative law judge is required to treat global assessments of functioning, or GAFs, which are part of the diagnostic access for psychiatrists, or were, at least from 1980 through 2013, as medical opinions, and had to review and evaluate those. Can I just stop you on your second point? Because I'm not exactly clear what your position is. Is it that the ALJ, in addition to reviewing and considering them, has to sort of expressly list them all out somewhere in the opinion? Well, I don't know if he has to set them out in a special place, although this judge, in fact, and I'm sorry, excuse me, I have laryngitis, and I'm having a little volume trouble here. The administrative law judge, in fact, did have a section of his decision which he entitled opinion evidence, and within that he dealt with four opinions, three from state agency doctors, one from a nurse practitioner who had just recently started treating Mr. Sizemore, and then kind of strangely, he took a questionnaire that Mr. Sizemore's mother had filled out at the beginning of the process and he treated that as opinion evidence. So I don't think that he had to put it there is the answer, but I do know... My question wasn't whether he had to put it there. My question is, I'm just trying to get a handle on whether you're making more of a procedural kind of an argument, that the problem here is that the ALJ literally did not mention each of the GAF scores, or whether you're making more of a substantive argument that in light of all of the GAF scores, he got it wrong. Well, I do think he got it wrong, but I'm making the formal argument, Your Honor. I'm not asking for reversal. Well, mention and evaluate it per Social Security regulations. But the ALJ says, I looked at everything in the record. It does. And normally, when an ALJ says that, we presume that is correct. We don't require that you go on to actually list all the things that you looked at. Well, there's a specific mandate in the regulations, CFR 404.1527, which says that an ALJ must evaluate and weigh every medical opinion of record using specific criteria. The judge sort of did that as to the certain narrative opinions, which he addressed as opinions, but he ignored the GAFs. He mentions three, but there were 14, and of the three that he mentioned, those were three of the four highest. There were two 50s, a 50 to a 55. Now, there was one other one that he didn't mention, which was 55. But beyond that, there were psychiatric offered GAFs that were as low as 40, and there were therapist ones that went as low as 25. Weren't the really low ones, though, didn't they say he was in detox at the time, or didn't they specifically say he had much higher scores during the same year? Well, you know, there's no question that his situation is complicated. You know, my own view is that the record supports the idea, and if there had been the full panoply of GAFs, I think it would have given him a better view, and the reviewing court, too, a better view that this is a person who is extremely erratic and that it's not unusual for there to be a mixture of substance use with a person with bipolar disorder. You know, that came up. One of the cases that I cited in the brief and I thought was quite instructive was the, I don't know if I pronounced this right, although it's easier than my name, but Pate-Fires, I guess, versus Astru in a circuit case from 2009. And there the court did a litany. The court actually reversed the decision and said, look, look at this litany of GAFs. And those ranged from a little lower point to Mr. Sizemore. There were more of them, but not that many more. They went from a low of 10, which was kind of off the charts on the bottom, to a high, I think, of 59, 58. And the court definitely took the position these are themselves, they are diagnostic, they are medical opinions, but my view is that they do have to be evaluated, and you get a distorted view, especially in a case like bipolar. Social Security itself in the regulations recognizes in the case of mental illness, depending on the disorder, that there is variability and the symptoms may be intermittent. But the interplay of alcohol, in his case, and the effects, whether that's cause or effect, of his mental illness was never fully determined by the ALJ. He made a lot of references to it, and he talked a lot about it, and he did a litany of chronology of medical treatment where he emphasized certainly the alcohol part. But at the end of the day, he said, look, if alcohol is material to the claim that I can't consider the impairment, but I'm not going to make that judgment. So he deferred that judgment, it's never been made, and he did not make the conclusion, yes, you take away the alcohol and this gentleman is sound and no longer disabled. But Social Security itself, I've been arguing this for several years, because I couldn't in my own mind understand how Social Security, using its explanation and definition of what constitutes a medical opinion, did not recognize GAFs as medical opinions. It seemed to me, even though it's a numerical scale, there is an accompanying verbal index, which provides the verbiage, and if that verbiage were written into a medical report, I think that a judge would say, you know, this is an opinion and would deal with that, and I don't see the difference. But the Social Security Administration, I think, has now conceded that point, because they issued an administrative directive. I did not know about this and did not argue it at the district court. It was only afterwards, when I was trying to prepare for this appeal, that I came across the case of Emmerich v. Colvin, which is a Middle District of North Carolina case that is cited in my brief. And in that case, I cited it not for its holding, but because there were extensive excerpts from this administrative, what they call an administrative mechanism, to the Social Security Administrative Law Judges. And in that, they direct explicitly that ALJs are to evaluate GAFs pursuant to 20 CFR 404-1527 and treat them as a medical opinion. It says explicitly these are medical opinions. The ALJ here didn't do that. He didn't evaluate any of them as medical opinions, but he ignored most of them in any case. I mean, there were 14 altogether. And one of the complaints, one of the arguments that I made here, is that this judge did what I thought was untoward amount of cherry-picking, or what I call cherry-picking, and some of the courts have used that term, of evidence. He took things out of context. I think he distorted testimony. There probably won't be time for me to address that,  and were plainly not reflections of what was actually going on with Mr. Sizemore. So it's part of a larger picture in that respect. But I think that he had an obligation to evaluate the GAFs, at least those from the psychiatrists, as medical opinions, and he should have done it. Just as one example, he did mention a report by Dr. Hayes, who is a psychiatrist, and this was at a time when Mr. Sizemore went into a treatment center, and he said he didn't mention his GAF, which was 50 at the time he was discharged. One of the ones he mentioned was a GAF of 50 at the time of discharge, but that same psychiatrist had rated the GAF at just 25 in admission, which is an extraordinary low rating, and he also opined that in the prior year it had not been higher than 45. Some of the cases that I've cited contain either statements by the court or a recapitulation of testimony where vocational experts have said, oh, you know, you get down in that level, you get down below 50, that's not a person that can work. So, I mean, these communicate. The ratings alone communicate to vocational experts, as recited in some of these cases, that that creates a person or that you would classify a person as disabled with such a low GAF. So, I mean, this is not harmless. I mean, you were talking about the line, crossing the line. The 55s maybe suggest a person not disabled. A 40 or a 25, I think, suggests the opposite, as do the 45s, of which there were several. But with that administrative directive, I think that the social security admitted, they say these are medical opinions, and they reference the regulation which says how you deal with medical opinions. And I think the judge did not do that, and he had to do that. And without doing that, we don't know the impact. We don't know how he sorts through the evidence to say, well, okay, it's only because he was drinking at that time, and that's why he wasn't functioning very well. The judge does that a little bit in his narrative, but he doesn't do it with an eye toward how low the functioning really was seen by the psychiatrist. I believe that's erroneous. I'd like to, if I may, also mention about Masseau. Excuse me. Is it okay for me to bring my water up here? Of course. Okay, thank you. I apologize. In the Masseau case, the court, everything was centered on a moderate limitation in concentration. In this case, the ALJ found not only a moderate limitation in concentration but also a moderate limitation in social functioning. And he did something which I thought was a little unusual, a little peculiar, but he said that he had adopted the psychological profile or evaluation that had been prepared by one of the non-examining state agency psychologists, Monica King. And the ALJ then, in his question of the vocational expert and also in the residual functional capacity which he adopted for Mr. Sizemore, said that he would have to have no public contact. But that did not address the moderate limitation in social functioning that was opined by Dr. King, the report that he adopted. Dr. King went much farther than that. She had filled out what's called a mental residual functional capacity evaluation, and in that evaluation, she said that he would be unable, well, he would have a moderate impairment, not unable, but a moderate impairment to the same level in his ability to accept instructions and respond appropriately to criticism from supervisors. Well, there's nothing in the RFC or the question of the vocational expert to talk about either reduced contact with supervisors or a position where criticism is minimized or some element to address that. He also, she rather, Dr. King said that he had a moderate impairment in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and that he would have a moderate difficulty in maintaining socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. So the ALJ said he adopted it. He gave this report significant weight. He said that he used that in coming to his conclusions that there were moderate limitations in social functioning and also in concentration. But then he didn't really make any allowance for it. For the concentration, on the concentration end, his question limited it to one- and two-step tasks, which I don't see a material difference between that and what this court said in Colvin was inappropriate in terms of addressing the deficiency in concentration, persistence, or pace. He added an element, I guess, that should be in a non-production setting. And the district court in the Western District has plainly adopted that as its standard. That's okay. Colvin doesn't apply. If you add an element that it should be at a non-production rate along with unskilled work or a simple one- and two-step task. But I don't, you know, as I get older, I get more tense, or maybe that's just a myth. And I was always the same. That's possibly true, too. But, you know, I can't think through how just being at a non-production rate means that you don't have to pay attention to your job. The court in Colvin said that the restriction did not address a person's inability to stay on task. And so whether you're working at a fast production rate or you're just working, I believe that there is an expectation or has to be an expectation that you actually stay with the work. The ALJ did not ask the vocational expert to quantify that. He didn't say to the vocational expert, well, if it's non-production, how much time can the person be staring out the window or drifting away from the work space? I don't remember the record nearly as well as you do, but I thought there were reports that explained that he could maintain concentration for two hours at a time. Wasn't there something about this? Yes. And when you add in some breaks, that gets you to an eight-hour day. Dr. King, that was part of what Dr. King, Dr. King had a summary, but her summary itself, yeah, typically in these mental residual functional capacities, it's a form and they fill it out and check it and evaluate in a variety of categories. And she did that. And then at the end of that, she said, well, he does have the capacity in a low-stress environment to maintain concentration for two-hour periods at a time. There may have been a little bit more to it. I have it here, but I'll never find it. Papers go flying. But she said that, but that didn't even address the other restrictions that she had found. Okay, but in terms of the concentration problem, it does seem like, you know, the question is, is there evidence in the record that supports the finding? That looks pretty good. Well, I guess I don't think it, I still don't think it meets the Colvin standard because it's not just, well, okay, excuse me, let me grant that. But I think that that is evidence. It's just not consistent evidence with what she said. I actually think I didn't do a good job of emphasizing this. I think the moderate limitation in social functioning is a much bigger issue because I just don't think that was addressed. And the courts are interpreting Colvin as if it only applies to concentration, but that isn't. 96 AP talks about things specifically like accepting criticism. That's in the footnote in Colvin's, and I think my time is up. I think your red light's up, and we'll get you back. You have some rebuttal. Yes, thank you, Your Honor. I did, excuse me. Mr. Montenegro. Thank you, Your Honor. My name is Leo Montenegro, appearing for the defense deputy acting commissioner of Social Security. If I might address the GAF global assessment of functioning issue first. These cases, and this one as well, usually involve conflicting medical evidence and the resolution thereof. And this is medical evidence that claim it's medical problems and associated functional limitations, whether those functional limitations are so extreme as to establish disability. Now, the Social Security Administration has conceded that GAF scores can be part of a medical opinion. Social Security actually has a very broad definition of medical evidence. GAF's a very wide net to that effect. This is explained in the regulations at 20 CFR 4.4.15.12 and 15.13, which state that medical evidence is any evidence about your nature and severity of your impairments, essentially what your medical problem is and how does that affect your ability to work. And the issues, however, for a disability evaluation are slightly narrower than that. That is, what medical problems do you have and how do they actually affect your ability to perform work-related tasks. Now, in this case, opposing counsel, the claimant is arguing that GAF scores mentioned in the record are of such significance as to overturn or invalidate the opinion evidence cited by the ALJ as supporting his findings about functional limitations. Now, while Social Security agrees that GAF scores can be medical opinions, this is only in the context of the entire opinion of that particular medical source. Now, medical opinions are opinions that come from what the agency terms as acceptable medical sources. This is essentially doctors or psychologists. In this case, the ALJ acknowledged all of the GAF scores, I should say acknowledged all of the opinions from the physicians and psychologists that were relevant and for most of them, I believe, mentioned the GAF scores. And where he didn't mention the GAF scores, it's because he mentioned the actual narrative opinion of that physician or psychologist. To walk through this, I should say that there were two occasions on which claimant went through detox and following each one of those detox visits, he underwent continuing therapy afterwards. And this is mainly where the GAF scores in the record come from. And most of these GAF scores are from what the agency would call unacceptable medical sources. That is not doctors, not psychologists, so they're not medical opinions. So, as we mentioned in our brief, most of the GAF scores at issue aren't really medical opinions because they aren't from a physician or a psychologist. They're from counselors or therapists instead. As to the GAF scores from the physicians, during one detox, there was a GAF of 55 from Dr. Black and the ALJ discussed that and also discussed Dr. Black's opinion of a completely normal mental status examination. That's at pages 34 and 313 in the record. Examining psychiatrist Dr. Asin-Newton mentioned a GAF of 50 and the ALJ discussed that GAF and Dr. Asin-Newton's actual narrative opinion. This is at pages 34 and 445. The same is true for Dr. Pretender, who was examining claimant, I think in connection with another detox session, and that was at pages 35 and 460 and 464. And Dr. Brogan assessed a GAF of 50 in connection with another detox where it might have been a therapy following that. And the ALJ discussed this report and the GAF score, pages 471 and 35. And finally, the ALJ did mention Dr. Hayes, whom my opposing counsel referenced, who believed the GAF was 40. The ALJ didn't mention that GAF, I should say, but did discuss the mental status examination. That's at pages 36 and 492. So to the extent that claimant is suggesting that the ALJ didn't give proper consideration to GAF scores, at least those were medical opinions from doctors or psychologists, I would have to disagree with that. The ALJ wrote a lengthy, well-thought-out, considered opinion addressing the medical evidence in this case and describing what he relied upon. And to the extent that claimant has argued substantively that the ALJ was wrong in relying on the evidence that he relied upon, I would point out that the ALJ discussed the GAF scores, and where he didn't discuss the GAF scores, he also discussed the actual narrative opinions from those physicians and psychologists. I just want to make sure I understand exactly what you're saying. So am I right, there's 12 GAF scores in the record? I haven't counted, but yes, I think that's about it. And the ALJ mentioned three, is that right? I think it's three, and I would point out that of the 12 or whatever number it was, most of them weren't medical opinions. So you're saying that the remaining nine all fall into one of two categories, either they're not medical opinions or the ALJ, although he didn't mention the number, did discuss the underlying opinion. Yes, Your Honor. Because the medical opinion, each source, each physician or doctor has a medical opinion, hopefully, if they've expressed one, I should say, about the claimant's functioning, their ability to do work-related tasks and the limitations thereon. And when the ALJ is looking at an opinion or looking at medical evidence from a medical report, say, from a certain doctor and is presented with a narrative explanation of what the work-related functional limitations are accompanied by a number, I would submit that it's not a problem if the ALJ looked towards the actual narrative description of what the claimant could and couldn't do versus looking at the bare number, which by itself doesn't say much, which, as my opposing counsel has conceded, would require some kind of discussion to support it and which the administrative message, the agency's policy statement about GAFs, the agency does concede, as I said, they're medical opinions or they can be part of one, but that they have to be accompanied by something else to be of any real value. While it's tempting to look at a number from a medical source and say, that is an accurate representation, that's something I can work with, in reality, you have to go with what the doctor actually said, what the actual discussion is, because the number by itself is meaningless and, as my opposing counsel also said, and I want to emphasize, the proponent of the GAF scale, the American Psychiatric Association, I believe, has renounced it. Although it was in effect at this time, it was supported by the American Psychiatric Association, I believe, at the time of this ALJ's decision. The American Psychiatric announced it in later versions of its publication, the GSM-5, the Diagnostic and Statistical Manual of Mental Disorders. They renounced it for the very reasons that I'm forwarding here, that it's vague, that it's not accurate, and that it's just not very helpful as a predictive tool for diagnostic purposes. However, I'll say again that the agency still recognizes it as a possible medical opinion, because the agency does take a broad view of what constitutes evidence and it might be accompanied by some narrative explanation of other evidence that would make it useful. So, again, as to GAF scores, I think the district court got it right. The ALJ sufficiently discussed the medical opinion evidence of record, whether it's a GAF score or whether it's a narrative opinion or whatever form it took from that particular doctor or psychologist. And the ALJ cited evidence to support his findings as to the claimant's mental functional limitations. If I might address the Masseau issue as well, I would say that the Masseau court in that case, that this case is distinguishable. The Masseau court in that case identified a problem with the logical flow of the ALJ's reasoning. The ALJ made a regulatory-required analysis, a preliminary analysis of mental functional limitations, in which he found moderate difficulties with concentration, persistence, or pace. But then when the rubber met the road and the ALJ actually had to ascertain work-related functional limitations, there was nothing in that finding that reflected the earlier preliminary finding of moderate difficulties in concentration, persistence, or pace. And the Masseau court found that to be too great of a logical leap and remanded on that basis, saying that perhaps on remand the ALJ can explain what, if any, connection there is between that preliminary analysis and the actual functional limitations assessed. In this case, there is no logical leap. As the district court found, the ALJ did precisely what was expected based on Masseau and explained the reasons connecting those preliminary findings to the actual work-related mental functional limitations. Further than that, the ALJ also relied on Dr. King's opinion, as my opposing counsel stated, gave Dr. King's opinion significant weight. And Dr. King, a psychologist, explained, conducted that same preliminary analysis and explained how difficulties with concentration and persistence were related to, still, the ability to complete simple tasks, work procedures, and make work decisions, and that the claimant might have difficulties carrying out detailed instructions. The ALJ's finding as to functional limitations reflected that, and the ALJ's reliance on Dr. King's opinion cured any Masseau problem by itself, because, as I said, Masseau reflected a logical leap in the ALJ's decision-making. Here there was no such leap. The ALJ pointed at a particular psychologist's opinion, said, I'm giving that significant weight, and as such there was no break in the reasoning. The ALJ didn't have to explain anything further, although he did here, because in Dr. King's opinion, Dr. King did all the footwork, did the explanation, and really the ALJ, relying on Dr. King's opinion, had nothing else to add. It really wasn't in a position to explain why Dr. King's opinion was psychologically correct. Dr. King, as a psychologist in the ALJ, is merely pointing to that opinion and saying, I'm relying on that. So, as to the Masseau issue, we submit that, first, the ALJ gave sufficient reasons, and, second, that there was no logical leap problem as described in Masseau. As to the remaining issues raised by the claimant about cherry-picking and misinterpreting and mischaracterizing evidence, I would submit to the court that, as I said initially, these cases generally involve the resolution of conflicting evidence and the claimant's disagreement with how that evidence is resolved. And that final argument by the claimant is, essentially, disagreeing with the claimant's resolution of evidentiary conflicts. And I don't believe that this is well explained in the ALJ's decision. The ALJ's decision is somewhat unusually lengthy at almost 30 pages and was addressed by the district court and, again, in our brief. I don't believe that there were any problems with the ALJ's resolution of the conflicting evidence or that there was any obvious legal error in the ALJ's addressing that evidence. If there are no questions, Your Honor. Thank you, Mr. Montenegro. Thank you, Your Honor. I have a few responses. First of all, I don't think it's fair to talk about why the American Psychiatry Association changed its way of diagnosis. They didn't just remove the GAF. They just adopted a wholly different diagnostic scheme with the DSM-5. And, you know, people complained, I think it's true, about subjectivity and some other issues with the GAF score. But it wasn't just that. It was a five-axis diagnosis, and they just dumped the whole idea. But whether they did or didn't, that was in use from 1980 through 2013, and because the Social Security Administration specifically says, particularly with mental illness, you have to have a longitudinal record. It's before listing 12 in the listings of impairments. Those are going to come up again and again and again. This is not going to go away any time soon because it is still going to be seen as a display of how impaired a person is seen to be. In terms of the judge having adequately reviewed the opinions and ignored the GAF, I disagree with that because the GAF is part of the diagnosis. It's not a separate and apart thing. And the ALJ, just like he did in what I think was the testimony and all, he extracted little pieces. He extracted the things that showed normality. Oh, he made good eye contact, but then he ignored things like, well, his judgment was rated as poor. He overlooked some of the observations of the doctors, and it was up to him to take the full opinion and to evaluate not just the mental status examination observations, but the actual opinion of, well, how impaired is this person is being made by the person there, and that is encapsulated specifically in the GAF. I didn't see any doctors other than the doctors for Social Security who offered any opinion as to what Mr. Sizemore's functional capacities were. The Social Security doctors did because they were instructed to, but not the doctors who treated him. So I don't think it's true that the judge can ignore something which does speak to function and just ignore it. It's just not built into the thing. There were a total of, let me say, 14 scores if you count the ones. There were seven from psychiatrists and seven from therapists is what I got. But two of those are where you had a person both making a current assessment and a past assessment. And one therapist did that, and then the doctor that I mentioned at the facility gave three. He gave one at admission, one at discharge, and then he offered an opinion about what it had been in the prior year, and that was a 45, which is a low level. In terms of Massey, I'll just conclude by saying that I don't think the ALJ can not do what he's supposed to do in terms of evaluating the RFC by just deferring to a state agency, not examining psychologists. He can't just let her make the connection. He has to make the connection, and I feel that he did not do that. Thank you very much. Thank you, Mr. Virgil. Thank you. We'll come down and greet counsel and proceed on to the last case.
judges: Paul V. Niemeyer, Robert B. King, Pamela A. Harris